IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Betty J. Pinson, ) | |
| ) | Civil Action No. 8:05-2389-DCN-BHH |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Jo Anne B. Barnhart, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

On July 20, 2001, the plaintiff filed an application for DIB alleging disability beginning January 2, 2001. The application was denied initially and on reconsideration. On May 13, 2002, the plaintiff requested a hearing, which was held on March 4, 2003. Following the hearing, at which the plaintiff and her attorney appeared, the administrative law judge considered the case *de novo*, and on May 8, 2004, determined that the plaintiff was not entitled to benefits. On April 16, 2004, the Appeals Council adopted the ALJ's decision. The

___
[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Appeals Council subsequently set aside its decision to receive additional evidence. On July 15, 2005, the Appeals Council again adopted the ALJ's decision, making it the final decision of the Commissioner.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

> (1)    The claimant meets the nondisability requirements for a period of disability and Disability Insurance benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.
>
> (2)    The claimants has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)    The claimant's arthritis and degenerative disc disease are severe impairments, based upon the requirements in the Regulations (20 CFR § 404.1521).
>
> (4)    This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> (5)    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.
>
> (6)    The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR § 404.1527).
>
> (7)    The claimant has the following residual functional capacity: light work requiring the lifting/carrying of up to 20 pounds occasionally and 10 pounds frequently. She is able to stand/walk for up to 6 hours per day. She is able to sit for at least 6 hours per day.
>
> (8)     The claimant's past relevant work as unskilled sewing machine operator did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).
>
> (9)    The claimant's medically determinable arthritis and degenerative disc disease do not prevent the claimant from performing her past relevant work.

> (10) The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability

to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

The plaintiff was 49 years old at the time of her alleged onset of disability. She has a seventh grade education and past relevant work as a draw wind operator and sewing machine operator. She alleges disability as of January 2, 2001, due to arthritis and degenerative disc disease.

The plaintiff has a history of carpal tunnel release surgery in 1993 and 1995 (Tr. 109).

On December 18, 1998, the plaintiff presented to Dr. Franklin Epstein with complaints of cervical and left arm pain. An MRI demonstrated a disc bulge at C3-C4 and C5-C6 (Tr. 135). Dr. Epstein diagnosed left cervical radiculopathy (Tr. 132). On January 14, 1999, Dr. Epstein performed cervical disc excision and fusion surgery (Tr. 107-08).

At a follow-up appointment on February 5, 1999, Dr. Epstein noted that the plaintiff had no further neuropathic pain in her arm or hand and that she had better than expected range of motion of the neck. The plaintiff was returned to work as of March 1, 1999 (Tr. 121).

On August 2, 1999, the plaintiff returned to Dr. Epstein for a follow-up appointment and complained of pain in the neck, shoulders, arms, back and left leg. After hearing her complaints, Dr. Epstein opined that the plaintiff was clinically depressed. Examination revealed preserved reflexes and good range of motion in the neck, and x-rays demonstrated good alignment and stability at C6-C7. Dr. Epstein noted that the plaintiff was stable and prescribed Celebrex as an anti-inflammatory and Celexa as an anti-depressant (Tr. 120).

At a follow-up appointment on November 1, 1999, the plaintiff complained of neck and low back pain. Dr. Epstein noted that the plaintiff's pain was mechanical rather than radicular, that Celebrex helped with her pain, and that the plaintiff had chosen not to try Celexa. Examination revealed preserved reflexes, strength in the plaintiff's arms and

legs, and a normal gait. The plaintiff was continued on Celebrex and prescribed Ultram (a non-narcotic analgesic) (Tr. 120).

On May 24, 2000, the plaintiff presented to Dr. Epstein for a follow-up appointment. He noted that the plaintiff had been doing "fairly well with the cervical spine" The plaintiff complained of lumbar back pain that radiated into her right hip region. Examination revealed tenderness at the right L4-L5 and L5-S1 facets in the right sacroiliac joint, normal bilateral deep tendon reflexes, normal lower extremity muscle strength, straight leg raising to 90 degrees with no radicular symptoms, and an ability to heel and toe walk without problems. X-rays demonstrated some lumbar arthritic changes and an MRI demonstrated degenerative arthritis of the lower spine with no appreciable herniation. Dr. Epstein's assessment was lumbar arthropathy, and he administered injections to the right L5-S1 and sacroiliac joints (Tr. 119).

The plaintiff had a follow-up appointment with Dr. Epstein on June 8, 2000, at which he noted that the plaintiff had received significant relief from her previous lumbar injections. Examination revealed normal muscle strength and straight leg raising to 90 degrees without radicular symptoms (Tr. 118). On June 22, 2000, it was noted that the plaintiff's lumbar pain had significantly improved and that she was doing well (Tr. 117).

A lumbar myelograph on July 17, 2000, demonstrated L4 radiculopathy with a mild disc bulge at L3-L4. Upon review of the myelograph, Dr. Epstein recommended that the plaintiff return to work "and do the best she can." (Tr. 122-23).

Dr. William Sawyer examined the plaintiff on January 4, 2001, for complaints of hand and right hip pain. Examination revealed tenderness along the left thumb and right hip (Tr. 144).

On January 8, 2001, the plaintiff was examined by Dr. John Handy for evaluation of hand and hip pain. She stated that Celebrex had given her considerable relief of her hand pain. Examination revealed good strength, normal joints, normal movement of

6

the hips and normal deep tendon reflexes. Laboratory blood work was normal. Dr. Handy's impression was tendonitis of the thumb and right trochanter bursitis. He also stated that the plaintiff's job was "incompatible with her and I doubt whether a physician can make much difference in that regard." (Tr. 109 -110).

The plaintiff returned to Dr. Epstein on February 2, 2001, for a follow-up appointment. He noted that the plaintiff had extensive cervical and lumbar degenerative disc disease and had managed fairly well with medication. Examination revealed no focal motor paralysis, sensory loss or major reflex alterations. Dr. Epstein opined that the plaintiff was not capable of competitive employment and that she should seek permanent retirement (Tr. 116).

The plaintiff was seen by Dr. Melissa Richardson on September 25, 2001, for a consultative examination at the request of the state agency. The plaintiff complained of pain in her neck, lower back, hips and hands, and she reported that Celebrex helped some of her pain. She stated that she did some walking inside and outside of her home, required assistance with some of her housework duties and was able to drive. Examination revealed a supple neck, no tenderness over the spinous process in the cervical and lumbar region, full range of motion of the shoulders, elbows, wrists and fingers bilaterally; full range of motion of the knees, ankles and hips bilaterally; negative straight leg raising; normal gait pattern; and an ability to heel and toe walk. Dr. Richardson's impression was a history of cervical and lumbar degenerative disc disease, past bilateral carpal tunnel syndrome with good bilateral grip strength and a history of depression and anxiety (Tr. 136-37).

On October 9, 2001, Dr. Seham El-Ibiary, a state agency medical consultant, reviewed the plaintiff's records and completed a "Physical Residual Functional Capacity Assessment." Dr. El-Ibiary determined that the plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. Dr. El-Ibiary noted that the plaintiff had good

7

bilateral grip strength and that she had no limitations regarding fine and gross manipulation (Tr. 169-76).

Treatment notes of Dr. Sawyer from April through May 2002, reflect that the plaintiff continued to have back and neck pain and was diagnosed with degenerative disc disease (Tr. 179).

On August 9, 2002, Dr. Sawyer completed a Physical Capacities Evaluation form in which he opined that the plaintiff could sit three hours during a eight-hour day and stand two hours during an eight-hour day. He stated that the plaintiff could not use her hands for simple grasping, fine manipulation and repetitive motion tasks. He also opined that she could occasionally lift 10 pounds, could never climb, stoop, kneel, crouch or crawl, and that she had moderate pain (Tr. 177-78).

The plaintiff was examined by Dr. Epstein on January 13, 2003 for complaints of cervical pain radiating into the right upper extremity. Examination revealed tenderness of the right cervical facet joints and adequate muscle strength. An MRI demonstrated a solid fusion at C6-C7 without evidence of striking neural impingement elsewhere. Dr. Epstein opined that the plaintiff's symptoms were inflammatory in origin and administered cervical facet blocks. On February 6, 2003, he noted that the plaintiff's neck symptoms had fully abated following administration of the cervical facet blocks. However, the plaintiff continued to complain of a "crawling-like sensation in the right deltoid and triceps." Dr. Epstein increased the plaintiff's medication (Tr. 184).

At the hearing on March 4, 2003, the plaintiff testified that she had difficulty reading (Tr. 202). She testified that after her carpal tunnel surgery her hands and wrists felt better and that medication and injections helped her arm and neck pain (Tr. 212, 216-17). According to the plaintiff, her pain level was consistently at six or seven, on a scale of one to ten (Tr. 216). She also testified that after receiving injections, she was able to turn her neck better (Tr. 217). She testified that since her carpal tunnel surgery she had no strength

in her hands (Tr. 220).  She testified that she did not drive much because she could not turn her head, and that her husband and daughter help with household chores (Tr. 224).  She testified that she has given up her hobbies and that her daily activities consist of watching television, reading and "sit[ting] around and cry[ing]."  (Tr. 226).

## DISCUSSION

The plaintiff contends that the ALJ erred in failing to find her disabled. Specifically, the plaintiff alleges that the ALJ erred in (1) failing to give adequate weight to the opinion of her treating physicians; and (2) finding that the plaintiff could return to her past relevant work as a sewing machine operator.

The plaintiff first contends that the ALJ erred in disregarding the opinions of the plaintiff's two treating physicians, Dr. Epstein and Dr. Sawyer.  Dr. Epstein, the plaintiff's treating neurosurgeon, submitted a narrative report dated February 2, 2001 in which he recounted the plaintiff's history of extensive cervical and lumbar degenerative disc disease after a cervical microdiscectomy and fusion on February 19, 1999.  Dr. Epstein concluded his report:

> The upshot of this is that Ms. Pinson had unequivocal, premature, and rather advanced spinal degenerative disc disease.  It has lead to protruding discs in the lumbar spine and at least one outright herniation in the cervical spine.
>
> With anti-inflammatories, muscle relaxants and the like, she has managed fairly well.
>
> Nevertheless, her job requires 12 hours a day in a high volume production facility (Solutia).  She gives graphic descriptions of standing by her machine crying while doing her work because of the unrelenting pain.
>
> It is my medical opinion that this woman is no longer capable of performing her work and should take a permanent medical leave.

> Based on her experience and education background, I do not believe there is any other kind of competitive employment she could maintain to support herself, and I would strongly urge her to seek permanent retirement.

(Tr. 116).

The records of Dr. Sawyer, the plaintiff's longtime family physician, also document the plaintiff's history of chronic pain. The records show that over the years Dr. Sawyer attempted to treat the plaintiff's pain with different medications, with varying degrees of success. On August 9, 2002, Dr. Sawyer signed a Physical Capacities Evaluation for the plaintiff in which he stated that the plaintiff could sit for a total of 3 hours in an 8 hour day and stand/walk for only 2 hours in an 8 hour day. He also stated that the plaintiff would be unable to perform certain activities with her hands, including simple grasping and fine manipulation with her right and left hands. Furthermore, he found that the plaintiff would be unable to perform repetitive motion tasks with either both hands and/or both feet. Dr. Sawyer also found that pain would constitute a moderate and significant handicap with the plaintiff's ability to sustain attention and concentration and would eliminate her ability to perform skilled work tasks (Tr. 177-178).

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2); *Mastro v. Apfel*, 370 F.3d 171 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p, 1996 WL 374188, *5. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

10

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight, and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p, 1996 WL 374188, *4.

In discounting the opinions of the plaintiff's treating physicians, the ALJ found that "the restrictions set forth by Dr. Sawyer ... are not simply not supported by the weight of his own treatment notes or by the medical evidence considered as a whole. ... His conclusions are apparently based on the claimant's self-report rather than functional capacity testing or restrictions previously set forth in his treatment notes." (Tr. 26). With regard to Dr. Epstein's opinion, the ALJ stated: "The Commissioner of Social Security has exclusive power to determine whether the claimant is disabled within the meaning of the Social

11

Security Act. With that said, the objective medical evidence does not support the conclusion that the claimant is unable to sustain substantial gainful activity." (Tr. 26).

In this case, substantial evidence does not support the determination of the ALJ that the opinions of the plaintiff's treating physicians are not entitled to "controlling weight." As noted above, Dr. Sawyer clearly stated that the plaintiff could only sit for a total of 3 hours in an 8 hour workday and could only stand/walk for 2 hours in an 8 hour day. He also noted that the plaintiff had marked limitations in her ability to use her hands and that she would be unable to perform repetitive tasks with both her hands and/or her feet. Dr. Epstein, the plaintiff's treating neurosurgeon, opined that the plaintiff was no longer capable of gainful employment. These opinions are supported by evidence in the record, including the results of an MRI of the lumbar spine dated May 24, 2000, a CT scan of the lumbar spine on July 13, 2000, and an x-ray of the lumbar spine dated September 25, 2001. The plaintiff's subjective complaints are also supported by these objective medical tests. Various treatments and medications tried by the doctors provided some relief, but the record clearly shows a patient in chronic pain, both objectively and subjectively. The only contradictory evidence comes from the state agency consultants, who did not examine the plaintiff.

The record as a whole clearly supports the opinions of Dr. Sawyer and Dr. Epstein, who have been treating the plaintiff since at least 1999. These doctors see the plaintiff on a regular basis and are actively involved in her treatment. Given their long treatment history with the plaintiff, their opinions are entitled to controlling weight. There were simply no substantive inconsistencies in the record to justify the ALJ's rejection of the treating physicians' opinions. Therefore, the ALJ erred in failing to give the opinions controlling weight.

The plaintiff also argues that the ALJ erred in finding that she could return to her past relevant work as a sewing machine operator. As discussed above, the ALJ erred in disregarding the opinions of the treating physicians. If these opinions are given controlling

weight, as discussed above, the conclusion is inescapable that the plaintiff cannot return to her past relevant work and, further, that she is disabled. Therefore, rather than remanding the matter to the ALJ for further consideration, the court recommends that the decision of the ALJ be reversed and benefits be awarded to the plaintiff.

## CONCLUSION AND RECOMMENDATION

The record does not contain substantial evidence supporting the Commissioner's decision denying coverage under the correct legal standard, and reopening the record for more evidence would serve no purpose. Therefore, based upon the foregoing, it is recommended that the Commissioner's decision denying the plaintiff's application be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the plaintiff be awarded benefits.

IT IS SO RECOMMENDED.

s/ Bruce H. Hendricks  
United States Magistrate Judge

May 16, 2006  
Greenville, South Carolina